IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| KENNETH LIGGINS, | ) | |
| | ) | No. 12 C 8251 |
| Plaintiff, | ) | |
| | ) | Magistrate Judge Arlander Keys |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Kenneth Liggins' motion for summary judgment. Mr. Liggins seeks a remand or an outright reversal of the Commissioner's decision to deny his application for Disability Insurance Benefits and Supplemental Security Income. The Commissioner seeks summary judgment affirming the decision to deny benefits. For the reasons set forth below, Mr. Liggins' motion is denied, and the Commissioner's motion is granted.

## BACKGROUND

On March 2, 2010, Kenneth Liggins filed an application for Disability Insurance Benefits and Supplemental Security Income, alleging that he became disabled as of September 30, 2009. The Social Security Administration denied his application initially and on reconsideration. Thereafter, Mr. Liggins requested a hearing before an Administrative Law Judge, and the case was

assigned to ALJ Jose Anglada, who held a hearing in Mr. Liggins'
case on June 8, 2011.

At the hearing on June 8, 2011, the ALJ heard from Mr.
Liggins, who appeared with representation, and from Dr. Richard
Hamersma, who testified as a Vocational Expert.  Mr. Liggins
testified that he was born March 23, 1958, Record at 50, and has
two children, ages 24 and 26, Record at 52.  He testified that
he went to a year and a few months of college, but didn't
finish.  Record at 73.  He testified that he had been homeless
but living in Minneapolis, and that, about two years prior to
the hearing, his sister-in-law sent him a bus ticket to Chicago;
since then, he has lived with her, her husband and their two
children.  Record at 52-54.

Mr. Liggins testified that, after moving to Chicago, he
looked for a job but "was getting too ill."  Record at 59.  He
testified that, when it gets "real, real cold, I get arthritis
real bad.  My hands swell up.  My legs, I couldn't hardly move
them."  Record at 59.  He also testified that, when the weather
changes "my elements just kept coming up though.  You know, my
legs are real bad now.  I can't hardly walk.  I need a cane to
stand up properly.  I can't stand too long."  Record at 59.

He testified that he has arthritis in his knees. Record at
59.  And that his left knee is worse that the right knee.
Record at 60.  He testified that he had four hydrotherapy

2

sessions in Minnesota in 2009, but has not had any therapy since coming to Chicago. Record at 60-61. He testified that he has seen a doctor and is taking medication. Record at 61. When asked whether the medication helps, Mr. Liggins testified that "it leaves the pain and stuff. You know, when I sleep, I wake up a lot, you know, because my legs be crossing, and I can't sleep comfortable like that. I have to sleep on the floor with my legs extended up." Record at 61. He testified that he takes his medication every day, no matter how he feels; he testified that he took his medication the morning of the hearing and that, as a result, at the time of the hearing "I feel all right." Record at 62. With regard to side effects, Mr. Liggins testified that sometimes the medication makes him "a little dizzy" and "makes my hands shake, you know, real bad a lot." Record at 62.

Mr. Liggins testified that he has been treated for arthritis only, but that his back has also been bothering him and causing him pain. Record at 65. He testified that he had some testing done, but that his doctor has not yet determined what the problem is with his back. Record at 65. Mr. Liggins also testified that his doctor in Minnesota prescribed the use of a cane for mobility; he testified that the cane helps him keep his balance. Record at 62-63.

Mr. Liggins testified that he had a stroke about 15 years prior to the hearing.  Record at 66.  He testified that the stroke mostly affected his face and his legs. Record at 66.  He testified that, after his stroke, his left side sometimes goes numb.  He testified "[w]hen I sleep, I can't sleep on my left side.  I have to sleep on my right side to try to shift it and raise my left leg up.  But other than that, I don't have too many problems." Record at 81. He testified that he is able to grip his cane with his right hand, which is his dominant hand. Record at 81.

Mr. Liggins testified that he receives regular treatment at Cook County Hospital in Oak Forest.  Record at 67-68.  He testified that he was hospitalized once for leg cramps for about three days some time in 2008, 2009 or 2010.  Record at 70-71. Mr. Liggins did not remember exactly when he was hospitalized; nor could he remember the name of his regular treating physician at Oak Forest Hospital.  Record at 70-71.  He testified that he has never been referred for any kind of psychological evaluation, that he does not take any medication for depression or any other mental impairment. Record at 82.

With regard to his daily activities, Mr. Liggins testified that he sits around, and if the weather is nice, he tries to make it up the steps to sit on the porch; he testified that he also tries to help his brother-in-law around the house.  Record

4

at 71. He testified that he tries to straighten up his area of the house, but is unable to help with chores. Record at 71. He testified that he watches a little tv, but doesn't read. Record at 72-73. He testified that he used to play football, and that he played wide receiver for a semi-pro team; he testified that he is no longer able to play. Record at 74. He testified that he sometimes tries to walk down the street, but then he has to stop, find a shade tree and wait a few minutes before he can walk back. Record at 76. He testified that he "can't walk too far." Record at 76. He testified that, with the cane, he can probably walk a block or a block and a half; without it, he could maybe walk half a block before stumbling. Record at 77. He testified that he can stand for about 15 to 20 minutes, and that he can sit for half an hour. Record at 78. He testified that he could lift and carry 5 or 10 lbs., that he cannot lift groceries or pour orange juice with his left hand. Record at 78.

With regard to his employment history, Mr. Liggins testified that he formerly did maintenance work, fixing conveyor belts in a warehouse. Record at 54-55. He testified that the work was full-time, but obtained through a temp agency; he testified that he was on that job for about two and a half or three years. Record at 55-56. He testified that he also worked at Nino's for a couple of years making pizza. Record at 56-57.

He testified that he last worked at a car wash in Minnesota in 2008 or 2009. Record at 58. He testified that the car wash job was part-time and that, when it ended, he moved to Chicago. Record at 58. He testified that his job at the car wash mostly involved drying off cars, working with a team of others to dry the cars. Record at 80-81.

The Vocational Expert testified that he had listened to Mr. Liggins' testimony and reviewed the exhibits filed in the case, and that he was familiar with the jobs Mr. Liggins held in the past. Record at 82-83. The VE testified that he would characterize Mr. Liggins' past job in the warehouse, setting up belts, as a "material handler" and his past job making pizzas as a "food prep worker." Record at 83-84. The ALJ then asked the VE to consider a hypothetical claimant who was "closely approaching advance aged with a greater than high school education and past relevant work as [a material handler and food prep worker]," who could "lift and carry 20 pounds occasionally and 10 pounds frequently and can be on his feet, standing and walking about six hours in an eight-hour work day and sit about six hours with, normal rest periods"; is "unable to work at heights, climb ladders or frequently negotiate stairs"; "may only occasionally stoop, crouch, kneel, or crawl and may be expected to be off task about 5 percent of the time in an eight-hour work day due to pain and discomfort." Record at 85.

The VE testified that this person would be precluded from working as a material handler, but could still work in food prep. Record at 85. The VE testified that, if the hypothetical claimant needed a cane to ambulate, he would be precluded from working either job. Record at 85. The VE testified that, even with the cane, other jobs would be feasible; for example, the VE testified, this hypothetical claimant could perform some light, unskilled work jobs, done in what is basically a sedentary position, including jobs in inspection (DOT #727.687-054; 2,000 jobs); and hand packager (DOT #559.687-074; 7,000 jobs). Record at 85-86. The VE testified that these jobs were consistent with the DOT. Record at 86. The VE testified that the claimant could do these jobs even if he required the use of a cane to ambulate and even if he could not be on his feet, standing and walking, for more than four hours in an eight-hour work day. Record at 86.

Next, the ALJ asked the VE to consider an "Arthritis/Pain Residual Functional Capacity Questionnaire completed May 3, 2011 by Dr. Rubin at Oak Forest Ambulatory Health Center. *See* Record at 337-339. After one visit, Dr. Rubin diagnosed Mr. Liggins with osteo-arthritis in the knees, as well as other conditions, and she rated his prognosis as "fair"; she noted that he had reduced range of motion in his knees, joint instability, abnormal posture, tenderness, muscle spasms, abnormal gait and

impaired sleep.  Record at 337.  According to Dr. Rubin, Mr. Liggins' symptoms would frequently impair his ability to perform even simple work tasks; she thought he could sit just 5 minutes at one time before needing to move and that he could stand for just 5 minutes before he needed to sit down; she opined that he could sit, stand and walk for less than 2 hours in an 8-hour workday; she also noted that he could not tolerate prolonged sitting.  Record at 338.  Finally, she opined that he could never carry any weight (even less than 10 lbs.), that he had significant limitations in doing repetitive reaching, handling and fingering, and that his impairments would likely cause him to miss more than 4 days of work per month.  Record at 339. Based upon this assessment, the VE testified, Mr. Liggins would be precluded from working in any job.  Record at 87.  The VE also testified that, if the claimant could not lift more than 10 pounds, he would be unable to do any job at the light level, even if it were typically performed in a sedentary position. Record at 88.

In addition to the testimony described above, the ALJ considered a variety of medical records.  Records from the Hennepin County Medical Center ("HCMC") in Minneapolis, show that Mr. Liggins was treated there for his post-stroke symptoms. In November 2008, Mr. Liggins had at least five physical therapy sessions in the pool.  Record at 274.  On December 17, 2008, Mr.

Liggins visited the HCMC's walk-in clinic complaining of back pain and leg pain; the doctor who saw him, Dr. Heidi Coplin, noted that his pain was likely related to changes in his posture as a result of his stroke.  Record at 231, 286.  Dr. Coplin recommended that he continue his physical therapy sessions, use ibuprofen and warm packs and return if his symptoms worsened or failed to improve.  Record at 231.

On January 14, 2009, Mr. Liggins saw Dr. Gregory English, DO, complaining of back pain.  Dr. English advised him to return in about 8 weeks. Record at 229.  He was seen at HCMC several times in January 2009, both in the walk-in clinic and in the internal medicine department.  He complained of back and leg pain and requested pool therapy; he also complained about right side chest pain associated with arm movement.  Record at 236, 237.

On January 21, 2009, Mr. Liggins reported to the Hennepin County medical clinic for a scheduled nurse visit; at that time he denied any dizziness, chest pain or shortness of breath and reported that he was taking his medications as prescribed; the nurse, in consult with Dr. English, recommended that he continue his present medication and return to Dr. English as scheduled. Record at 283.

A medical opinion form signed by Dr. English on what looks to be January 15, 2009, indicates a diagnosis of "stroke

w/residual ambulation limitations + pain." as well as "depression from stroke." Record at 272. Additionally, Dr. English checked the box for "yes" on the question asking whether the patient has mental illness. *Id.*

Mr. Liggins returned to Dr. English's office for a follow-up appointment on March 11, 2009. At that time, he complained of knee pain, but indicated that his right side chest pain was "marginally better." Record at 281. Mr. Liggins reported "continued low back pain, mostly midline. as well as over the left sided low back musculature." Record at 281. He reported no "new weakness, although his left side has been weaker since his stroke." Record at 281. He reported that his back pain was non-radiating. Record at 281. Mr. Liggins reported, for the past couple of years, he has used a cane for ambulation, and that he can walk 1.5 blocks before being limited "by both SOB and leg/back pain." Recored at 281. Mr. Liggins suggested that pool therapy seemed to help. Record at 281. Dr. English ordered an X-ray of Mr. Liggins left knee and advised him to return in about 3 weeks for follow up. Record at 227.

On March 16, 2009, an x-ray was taken of Mr. Liggins' left knee; the knee was "within normal limits"; the specific findings were "[n]o bony lesion. Normal joint spaces. No significant effusion. Arterial calcification noted." Record at 280.

On April 9, 2010, Mr. Liggins was seen by Mark Conrad, PhD., a clinical psychologist who evaluated him at the request of the Illinois Department of Human Services. Record at 241. According to Dr. Conrad, Mr. Liggins reported struggling with depression and physical complications from his stroke about 11 years prior. Record at 241. He reported that he last worked about three years ago and had recently relocated to Chicago to be closer to family; he reported living with his sister and reported that his adult daughter lives nearby and helps him with cooking and cleaning. Record at 241. Mr. Liggins reported taking an anti-depressant in the past, but told Dr. Conrad that he was not taking anything at the time of the exam because he had no insurance and no money. *Id.* Based upon Mr. Liggins' performance during the approximately 30-minute evaluation, Dr. Conrad determined that he was "functioning within the average range of general intellectual ability" and was "generally able to participate in the management of his own funds." Record at 242. Dr. Conrad diagnosed Mr. Liggins with a mood disorder, resultant to his stroke and related medical issues; Dr. Conrad also noted that Mr. Liggins has "[p]roblems with social environment, occupational" and he assigned him a GAF of 58. Record at 242. A GAF of 58 falls toward the high end of the range indicating "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate

difficulty in social, occupational, or school functioning (e.g.,

few friends, conflicts with peers or co-workers)." DSM-IV, p.

32.

On April 15, 2010, Mr. Liggins underwent an internal

medicine consultative examination with Dr. M.S. Patil. At the

time of the evaluation, Mr. Liggins

> gave a vague history of a stroke in 1995. He is not
> sure which side was his stroke. He was admitted to
> John Stroger hospital for four days. He then moved to
> Minnesota where he received physical therapy for few
> weeks. He felt better and was working up until summer
> of 2009. He moved back to Chicago in Dec. 2009. He
> plans on consulting a public health facility in the
> near future for a routine physical examination and
> examination of his back. His back has been bothering
> him for the past year or so. He denies major injury
> or surgery on his back. He complained of intermittent
> mild pain and stiffness in his back especially in the
> morning. he is not able to bend and lift like before.
> He can hardly stand or walk for more than thirty
> minutes or pick up more than 10-15 lbs. Claimant
> denies gait imbalance, weakness/numbness in
> extremities, blurry vision, headaches, dizziness,
> urinary tract infection, fever, chills, bladder or
> bowel dysfunction. Claimant denies other medical
> ailments.

Record at 243. Mr. Liggins reported that he was not taking any

medication at the time of his evaluation with Dr. Patil. *Id.* In

his report, Dr. Patil noted "[m]ild chronic residual paraparesis

of UMN type of left face" but an otherwise normal examination.

Dr. Patil noted that Mr. Liggins' blood pressure was normal, his

blood pressure stable; he had no range of motion limitations, no

tenderness or joint pain, normal pulses and sensation, normal

gait, speech and hand dexterity.  Record at 246.  Dr. Patil also
noted that Mr. Liggins' "mentation and memory" were normal at
the time of the examination.  Record at 246.

On April 19, 2010, Dr. Jerrold Heinrich completed a Mental
Residual Functional Capacity Assessment for Mr. Liggins.  *See*
Record at 250-252.  According to his report, Dr. Heinrich
determined that Mr. Liggins was "moderately limited" with
respect to his ability to understand and remember detailed
instructions; his ability to carry out detailed instructions;
his ability to maintain attention and concentration for extended
periods of time; and his ability to respond appropriately to
changes in the work setting.  Record at 250-251.  Dr. Heinrich
determined that Mr. Liggins was either "not significantly
limited" or that there was no evidence of any limitation with
respect to all other delineated areas concerning understanding
and memory, sustained concentration and persistence, social
interaction and adaptation.  *Id.*   In the written section of his
report, Dr. Heinrich described Mr. Liggins as "a 52-year old
male who is behaviorally limited by a mood disorder due to
medical conditions . . . ."  Record at 252.  Dr. Heinrich noted
that Mr. Liggins' "current reality-testing is intact.  His basic
cognitive functioning is adequate for day-to-day tasks. His
basic ADLs are fully intact, and he is able to complete
essential activities he chooses to do."  *Id.*  He noted that Mr.

13

Liggins could "understand, remember, and execute simple instructions consistently"; that he "can concentrate and persist adequately on tasks within an organized setting" and "can adjust to routine changes in his environment as long as they are not too frequent"; and that his "basic social skills are functionally adequate." In sum, Dr. Heinrich concluded, Mr. Liggins "retains the mental and behavioral capacity to do at least simple tasks within the limitations noted." *Id.*

A "Pyschiatric Review Technique" prepared by Dr. Heinrich on April 19, 2010 reflects mild restriction of activities of daily living and mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Record at 264.

On April 22, 2010, Dr. Richard Bilinsky, a consultant physician, determined that Mr. Liggins "does have paraparesis of the left side of face, but there is not any other objective evidence to support a limitation of any kind." Record at 249.

On October 4, 2010, Mr. Liggins went to the emergency room at Oak Forest Hospital for elbow pain; x-rays revealed no joint effusion, no acute fracture and no arthritis; there "was a 1-cm sized calcification seen in the medial collateral ligament of the right elbow joint." Record at 294, 319. On that same date, Mr. Liggins also had x-rays taken of his right knee joint; the

14

x-rays revealed "marked vascular calcification" – more specifically "atherosclerotic calcification of the popliteal femoral and tibial arches"; the radiologist noted that, based on the findings, the "[p]ossibility of diabetes should be ruled out."  Record at 296.

On February 21, 2011, Mr. Liggins underwent a CT scan of his head to investigate his complaints of headaches.  The scan revealed "[n]o acute intracranial hemorrhage" but did show "a hypodense area . . . in the left basal ganglia including the caudate nucleus and putamen with no significant mass effect on the left lateral ventricle frontal horn."  Record at 292. According to the report, the findings "may represent old infarct and/or resolving infarct."  Record at 292.  The scan also revealed "a hypodense area . . . in the left pons"; the report noted that "the possibility of subacute infarct cannot be ruled out."  Record at 292.  Finally, the scan revealed "a 2.5-cm soft tissue mass in the subcutaneous soft tissues overlying the left parietal region" "most likely either sebaceous cyst and/or fibroma."  Record at 292.

On March 14, 2011, Mr. Liggins was seen for a general medical exam; at that time, the examining physician noted hypertension, a swelling, mass or lump in his head/neck, osteoarthritis of the knees and tobacco use disorder.  The doctor recommended that he start patches for the latter and that

he see a general surgeon for the lump in his head/neck. Record at 300. He pursued the recommended plan with respect to the lump, had it aspirated with a needle and then underwent a course of antibiotics; he was discharged in good condition. Record at 304.

On May 3, 2011, Dr. Rachel Rubin, of the Oak Forest Ambulatory Health Center, completed an Arthritis/Pain Residual Functional Capacity Questionnaire for Mr. Liggins. Record at 337-339. At that time, Dr. Rubin met with Mr. Liggins for the first and only time, though she noted that Mr. Liggins was a regular patient of one of her colleagues, who was out on maternity leave. Record at 337. Dr. Rubin rated Mr. Liggins' prognosis as "fair" and noted that he had reduced range of motion in both knees, joint instability, impaired sleep, abnormal posture, tenderness, muscle spasms, and an abnormal gait. Record at 337. She indicated that Mr. Liggins' symptoms would frequently be severe enough to interfere with his attention and concentration, that he could walk only ½ block with or without his cane, that he could sit for just 5 minutes before needing to get up, etc.; that he could stand for just 5 minutes before needing to sit down, walk around, etc.; and that he could sit and stand/walk less than 2 hours total in an 8-hour workday. Record at 338. Dr. Rubin also noted that Mr. Liggins could never lift any weight – even less than 10 lbs. Record at

339. Finally, Dr. Rubin indicated that Mr. Liggins' impairments were likely to produce "good days" and "bad days" and cause him to be absent from work more than 4 days per month. Record at 339.

The ALJ issued his decision on August 15, 2011, finding Mr. Liggins not disabled. Record at 33-41. Initially, the ALJ determined that, given his earnings record, Mr. Liggins had to show that he was disabled on or before December 31, 2011 to be entitled to a period of disability and disability insurance benefits. Record at 33. After reviewing the evidence, the ALJ determined that Mr. Liggins had not been under a disability within the meaning of the Act from September 30, 2009 through the date of the decision. Record at 33.

At steps one and two, the ALJ determined that Mr. Liggins met the insured status requirements of the Social Security Act through December 31, 2011, and that he did not engage in substantial gainful activity after the alleged onset date. Record at 35. At step three, the ALJ determined that Mr. Liggins had severe impairments – namely, arthritis of the knee and a history of stroke/status post cardiovascular accident – but that none of his impairments, alone or combined, met or medically equaled the severity of a listed impairment. Record at 36.

Before turning to steps 4 and 5, the ALJ determined that Mr. Liggins had the residual functional capacity

> to perform light work as defined in 20 CFR 404.1567(b)
> and 416.967(b) except he can lift and carry twenty
> pounds occasionally and ten pounds frequently. He can
> be on his feet standing/walking six hours in an eight
> hour workday and sit about six hours with normal rest
> periods. He is unable to work at heights, climb
> ladders or frequently negotiate stairs. He may
> occasionally stoop, crouch, kneel or crawl. He would
> be expected to be off task five % of the time in an
> eight-hour workday. He would need a cane to ambulate.

Record at 37. Based upon this RFC, the ALJ determined that Mr. Liggins was precluded from performing his past jobs. Record at 39. However, given his age, education, work experience and RFC, the ALJ determined that Mr. Liggins could perform other jobs existing in significant numbers in the national economy, including light unskilled inspection jobs, assembly jobs and hand packaging jobs. Record at 40. Accordingly, the ALJ determined that Mr. Liggins was not disabled. Record at 41.

Mr. Liggins sought review of the ALJ's decision, and, on September 7, 2012, the Appeals Council denied Mr. Liggins' request for review, making the ALJ's decision the final decision of the Commissioner in his case. Record at 1. Mr. Liggins then filed this lawsuit, on October 15, 2012, seeking review of that decision. The case is currently before the Court on cross motions for summary judgment.

## Discussion

An individual claiming a need for DBI or SSI must prove that he has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his/her past relevant work; and, fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405 (g); *Steele v. Barnhart*, 920 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
In reviewing an ALJ's decision for substantial evidence, the
Court may not "displace the ALJ's judgment by reconsidering acts
or evidence or making credibility determinations." *Skinner v.
Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)(citing *Jens v.
Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  Where conflicting
evidence allows reasonable minds to differ, the responsibility
for determining whether a claimant is disabled falls upon the
Commissioner, not the courts.  *Herr v. Sullivan*, 912 F.2d 178,
181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate
and logical bridge from the evidence to her conclusions, so that
the Court may afford the claimant meaningful review of the SSA's
ultimate findings.  *Steele*, 290 F.3d at 941.  It is not enough
that the record contains evidence to support the ALJ's decision;
if the ALJ does not rationally articulate the grounds for that
decision, or if the decision is insufficiently articulated, so
as to prevent meaningful review, the Court must remand.  *Id.*

Mr. Liggins argues that the Commissioner's decision denying
benefits should be reversed or remanded because: (1) the ALJ
improperly weighed the opinions of Dr. English and Dr. Rubin;
(2) the ALJ failed to explain the evidentiary basis for his RFC
assessment; (3) the ALJ improperly assessed Mr. Liggins'

credibility; and (4) the Appeals Council erred when it declined
to consider new and material evidence.

A.   The ALJ's Consideration of Treating Physician Opinions

Mr. Liggins first argues that the ALJ improperly rejected
the opinions of Dr. English and Dr. Rubin.  Dr. English opined
that "due to ambulatory limitations and pain resulting from a
stroke as well as depression Mr. Liggins was unable to perform
work activities in the foreseeable future."  Brief in support of
summary judgment, p. 7 [Docket #16].

Initially, Dr. English's checking a box on a form
indicating that "[p]atient will not be able to perform any
employment in the foreseeable future," record at 225, is of
little consequence by itself. "[W]hether the applicant is
sufficiently disabled to qualify for social security disability
benefits is a question of law that can't be answered by a
physician. But the answer to the question depends on the
applicant's physical and mental ability to work full time, and
that is something to which medical testimony is relevant and if
presented can't be ignored." *Garcia v. Colvin*, 741 F.3d 758, 760
(7th Cir. 2013)(citing *Bjornson v. Astrue*, 671 F.3d 640, 647–48
(7th Cir. 2012); *Ferguson v. Commissioner of Social Security*,
628 F.3d 269, 272–73 (6th Cir. 2010)).  The ALJ did not ignore
Dr. English's opinion; he considered it in light of all of the
other evidence, which is what he was supposed to do.  A treating

physician's opinion is entitled to controlling weight only where
it is well-supported and consistent with the bulk of the
evidence; in the face of well-supported contradicting evidence,
a treating physician's opinion "becomes just one more piece of
evidence for the ALJ to consider." *Bates v. Colvin*, 736 F.3d
1093, 1099-1100 (7th Cir. 2013)(citing Bauer v. Astrue, 532 F.3d
606, 608 (7th Cir. 2008)).

The ALJ noted Dr. English's conclusion and gave it "some
weight since he had treated the claimant for a period of time."
Record at 38. The ALJ also noted, however, that Randy Duncan,
the vocational specialist asked to assess Mr. Liggins'
employability, determined that, with the limitations noted by
Dr. English, Mr. Liggins could still perform sedentary work,
with some additional limitations. Record at 38 (citing Record
at 224-231). The ALJ also noted that even Dr. English did not
specify the length of time the claimant would be unable to work.
Record at 39. Even more significantly, the ALJ noted that Mr.
Liggins' own testimony concerning what he could and could not do
was inconsistent with Dr. English's opinion. Mr. Liggins
testified that he could walk about a half a block without his
cane and a block or block and a half with it, that he walks up
the stairs, helps out around the house Record at 71, 77. He
testified that he can stand for about 15 to 20 minutes and that
he can sit for half an hour; that he could lift and carry 5 or

10 lbs., that he cannot lift groceries or pour orange juice with his left hand. Record at 78. All of this testimony is consistent with the ALJ's decision and supports his decision to discount somewhat Dr. English's opinion.

Dr. Rubin, in an "Arthritis/Pain Residual Functional Capacity Questionnaire completed May 3, 2011, opined, after a single visit with Mr. Liggins, that he had reduced range of motion in his knees, joint instability, abnormal posture, tenderness, muscle spasms, abnormal gait and impaired sleep – all of which, according to Dr. Rubin, would frequently impair his ability to perform even simple work tasks; she thought he could sit just 5 minutes at one time before needing to move and that he could stand for just 5 minutes before he needed to sit down; she opined that he could sit, stand and walk for less than 2 hours in an 8-hour workday; she also noted that he could not tolerate prolonged sitting. Record at 338. Finally, she opined that he could never carry any weight (even less than 10 lbs.), that he has significant limitations in doing repetitive reaching, handling and fingering, and that his impairments would likely cause him to miss more than 4 days of work per month. Record at 339.

The ALJ gave "some weight" to Dr. Rubin, who was not a treating physician, for a couple of reasons. First, the ALJ noted that Dr. Rubin's opinions were not supported by the

23

probative evidence of record; second, there was no indication that Dr. Rubin ever performed any kind of clinical evaluation of Mr. Liggins; rather, the ALJ inferred, the determinations were likely based on Mr. Liggins' subjective complaints. Whether or not that is true, it is clear that Dr. Rubin's restrictive limitations are substantially undermined by Mr. Liggins' testimony at the hearing. He testified that he could walk a block and a half with his cane, that he could stand for about 15 to 20 minutes and that he could sit for half an hour; he also testified that he could lift and carry 5 or 10 lbs. Record at 78. The Court rejects Mr. Liggins' arguments concerning the weight given to the opinions of Dr. English and Dr. Rubin.

B.    The ALJ's RFC Assessment

Next, Mr. Liggins argues that the ALJ failed to explain the evidentiary basis behind his assessment of Mr. Liggins' residual functional capacity. With respect to RFC, the ALJ determined that Mr. Liggins had

> the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he can lift and carry twenty pounds occasionally and ten pounds frequently. He can be on his feet standing/walking six hours in an eight hour workday and sit about six hours with normal rest periods. He is unable to work at heights, climb ladders or frequently negotiate stairs. he may occasionally stoop, crouch, kneel or crawl. he would be expected to be off task five % of the time in an eight-hour workday. He would need a cane to ambulate.

Record at 37.  The ALJ indicated that, in making these findings, he gave considerable weight to Mr. Liggins' own words and his recitation of what he did with his time.

At the hearing before the ALJ, Mr. Liggins indicated that, when he goes out, he goes alone and either walks or takes public transportation.  Record at 176.  He stated that he spends time with others about once a week and goes to church, shelters and staffing agencies on a regular basis; he states that, at least four times a week, he goes out to help to get food or supplies. Record at 177.  When indicating what areas are affected by his condition, Mr. Liggins checked lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, seeing, memory, completing tasks, concentration, and using hands. Record at 178.  He did not check sitting.  *Id.*

It is true that Mr. Liggins testified that he could not lift well with his left hand.  Record at 78.  But he also testified that he was right-handed.  He testified that he couldn't pour orange juice with his left hand; but he also testified that he *could* pour orange juice with his right hand. Record at 78.  He testified that he could lift and carry "[a]round five, ten, something like that" – and, given the nature of the discussion immediately preceding this statement, he may have been suggesting that he could lift this much with each hand, not in a combined total.  Record at 78.

Even more significantly, in a function report completed on March 28, 2010, Mr. Liggins represented that, after taking Advil and soaking in a tub, he would take the bus to the hospital, get checked for pain, "then fill out at least four to six applications a day at little stores or shops and then go home, find something to eat, soak in the tub again to relieve pain & then head for bed." Record at 173. Additionally, when asked on May 28, 2010 about his past work as a car wash attendant, Mr. Liggins described his duties and responsibilities and then apparently indicated that he could return to this job. Record at 192. He stated on the form that he "goes outside Mon-Fri to find a job & try to get medical help." Record at 176. This evidence strongly suggests that Mr. Liggins believed himself capable of working and undermines his claim – and any suggestion by a doctor – that he cannot work.

C.    The ALJ's Credibility Determination

Mr. Liggins next argues that the ALJ's analysis of his credibility was "perfunctory and insufficiently detailed." Brief in Support of Summary Judgment, p. 15. With respect to Mr. Liggins' credibility, the ALJ stated that: "[t]he claimant's testimony of symptoms and functional limitations, when compared against the objective evidence and evaluated using factors in SSR 96-7p, was not credible in view of the lack of supporting findings in the documentary records, diagnostic findings, the

daily level of activity described by the claimant and the

examination findings by the consultative physician (Exhibits 3E,

3F)." Record at 39. The ALJ then went on to give specific

examples of inconsistencies in Mr. Liggins' representations.

For example, the ALJ noted that Mr. Liggins' representation that

he went out every day to fill out job applications was

inconsistent with his assertion that he was unable to work.

Record at 39. The ALJ also noted that, although Mr. Liggins

testified that his medication made him dizzy, there was no

indication in the record that Mr. Liggins had ever tried to

change his medication or his treatment regimen. Record at 39.

   "[A]n ALJ must adequately explain his credibility finding

by discussing specific reasons supported by the record." *Pepper*

*v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v.*

*Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). The ALJ did this.

The Court agrees with Mr. Liggins that the ALJ's credibility

analysis was not particularly lengthy. But Mr. Liggins'

statements that he was actively looking for work – his admission

that he was not working, not because he was unable to work, but

because he had not yet found a job – is powerful evidence that

Mr. Liggins' claims of disability were not believable.

Additional analysis was almost unnecessary. The fact that the

ALJ provided additional reasons for finding Mr. Liggins'

credibility lacking further suggests that the ALJ's credibility findings should not be disturbed.

D.    The Appeals Council's Rejection of New Evidence

Finally, Mr. Liggins argues that the Appeals Council improperly rejected a medical evaluation and physician's report completed by Tharanum Zehra on October 4, 2011.  See Record at pp. 365-369.  The Appeals Council determined that the evaluation and report came after the ALJ issues his decision, and was, therefore, not properly considered in connection with that application for benefits.  Mr. Liggins argues that this was erroneous; he concedes that the report was prepared after the ALJ issued his decision, but he argues that the Appeals Council should nonetheless have considered the information because Dr. Zahra began treating Mr. Liggins in March, 2011, several months before the ALJ issued his decision.  *See* Brief in Support of Summary Judgment, p. 19.

The Social Security Regulations provide that "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. 404.970(b).  In Mr. Liggins' case, the Appeals Council advised Mr. Liggins that it had "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council" and

"found that this information does not provide a basis for changing the Administrative Law Judge's decision." Record at 1-2. The Appeals Council did note that certain evidence was dated after the ALJ's decision, but it does not mention Dr. Zehra's report in that paragraph; rather, that statement relates to medical records from Oak Forest Hospital, which are listed separately from Dr. Zehra's report on the Appeals Council Order referenced. Thus, as an initial matter, it is not clear that the Appeals Council denied review because of the date of the report.

But, even if the Appeals Council had applied 20 C.F.R. §404.970(b) to Dr. Zehra's report, the Court cannot say that decision was erroneous as a matter of law. Despite Mr. Liggins' arguments, the evaluation and report in no way indicates that it reflects treatment notes or observations dating from before August 15, 2011. The report is dated October 4, 2011 and reflects Dr. Zehra's observations and assessment on that date. There is nothing to suggest these findings would relate back to the very first visit on March 14, 2011 or any visit prior to August 15, 2011. Accordingly, if the Appeals Council really did decide to rely 20 C.F.R. §404.970(b) in connection with the report, its decision would be unreviewable. *See, e.g. Perkins v. Chater*, 107 F.3d 1290, 1293-94 (7th Cir. 1997)(absent some error of law in the application of the regulation, the Council's

decision whether to review is discretionary and unreviewable)
(citing *Damato v. Sullivan*, 945 F.2d 982-988 (7th Cir. 1992)).

Conclusion

For the reasons set forth above, the Court denies Mr.
Liggins' motion for summary judgment [#13] and grants the
Commissioner's motion for summary judgment [#20].  The
Commissioner's decision to deny benefits is affirmed.


Date: April 17, 2014

E N T E R E D:

_____

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT